Geraldine PILARCZYK, Plaintiff,

v.

Louis W. SULLIVAN, M.D., Secretary of Health and Human Services, Defendant.

No. 92 C 720.

United States District Court, N.D. Illinois.

Aug. 25, 1992.

Marcie E. Goldbloom, Frederick J. Daley, Ltd., Chicago, Ill., for plaintiff.

Craig A. Oswald, Asst. U.S. Atty., Chicago, Ill., for defendant.

## MEMORANDUM OPINION AND ORDER

SHADUR, Senior District Judge.

Geraldine Pilarczyk ("Pilarczyk") appeals the final decision of Secretary of Health and Human Services Louis Sullivan ("Secretary") denying her claim for disability insurance benefits under the Social Security Act, 42 U.S.C. §§ 416(i), 423(d).[1] Pilarczyk now moves for summary judgment under Fed.R.Civ.P. ("Rule") 56. For the reasons stated in this memorandum opinion and order, her motion is denied but this action is remanded to Secretary for the further review described here.

## FACTUAL AND PROCEDURAL BACKGROUND

### 1. Pilarczyk's testimony

Pilarczyk was born on March 12, 1933 and went to school through the 12th grade (R. 32). She worked at Sears, Roebuck & Co. from 1953 to 1987 (R. 83), when she was forced into early retirement (R. 39). From 1972 until 1987 she served as a "control buyer," keeping merchandise in stock for several mail-order houses. Pilarczyk did that job primarily while sitting, through the use of telephone, computer and paperwork (R. 38–39). No lifting was required (R. 39).

After leaving Sears Pilarczyk sold real estate in Chicago's western suburbs for about 3½ years (R. 30). In that line of work she spent about 60% of her time driving, standing or walking and the other 40% sitting (R. 35).

Pilarczyk quit the real estate business in February 1990 and has not worked since. She testified that severe back pain forced her to quit (R. 43–44). Pilarczyk experiences that pain in two distinct areas: (1) the lower back, shooting down into the right leg when she bends over suddenly or "move[s] the wrong way," and (2) "between the shoulders going up to the neck area," causing severe headaches (R. 44–45).

Pilarczyk also testified that she suffers from muscle spasms in the back of her neck that induce nausea (R. 64), from arthritis in her hands, hips, knees and left shoulder (R. 51) and from Raynaud's disease, an ailment affecting circulation in the hands and feet (R. 58–59). She said she cannot lift more than five pounds (R. 51). Because of her various ailments she takes seven different kinds of medication, primarily painkillers (R. 47, 155). Relatedly she suffers dizzy spells (R. 63–64) and feels "droggy"[2] in the mornings (R. 61), symptoms that she attributes to her medication.

Pilarczyk's daily activities include light housework and meal preparation. She

---

[1]. Further citations to the statute will simply take the form "Section —". Pertinent regulations, all of which are found in 20 C.F.R. § 404, will be cited as "Reg. § —".

[2]. Her lawyer explains this term as "a combination of drowsy and groggy" (P.Mem. 3 n. 2).

takes short walks several times a week and occasionally drives to visit her daughter or her sister, to see her chiropractor and to go shopping (R. 55–58).

### 2. Medical Evidence

Tests done on Pilarczyk in 1988 showed the presence of arteriosclerotic narrowings in the brain and some narrowing of the carotid artery (R. 121–24). Then after leaving her job in 1990 Pilarczyk underwent an esophagastoduodenoscopy procedure, leading to a diagnosis of superficial antral gastritis, hiatal hernia and short esophagus (R. 125–31).

On May 10, 1990 Dr. Donald Miezio, Pilarczyk's treating physician, delivered a telephonic report on her condition to the Bureau of Disability Determination Services (R. 132). He diagnosed Pilarczyk as suffering from "degenerative and [sic] osteoarthritis" in her back, hips and knee. Dr. Miezio also noted mild hypertension, superficial antal gastritis and a hiatal hernia. He mentioned that Pilarczyk ambulates without a cane, then summed up:

There is not a marked limitation of range of motion, there is no evidence of joint difficulties.... The neurological exam was negative.... The patient has a multitude of problems. All of her problems are nonsevere.

Dr. Allan Bernthal examined Pilarczyk on May 30, 1990 (R. 133). He diagnosed gastritis, with Pepto–Bismol recommended as treatment. Dr. Bernthal found that the gastritis imposed no work-related limitations.

Another medical report from Dr. Daniel Hirsen, dated September 13, 1990 (R. 138–39), refers to X-rays that showed "mild to moderate disk space narrowing in the C5–6 and C6–7 regions." But Dr. Hirsen added that "the mild degenerative changes in her cervical spine could not account for the

severity of her symptoms." He diagnosed fibrositis.[3]

Dr. Royal Reimer, a chiropractor, submitted a Physical Capacities Evaluation Form dated October 11, 1990 (R. 144–46). He found that Pilarczyk could (1) occasionally lift or carry 6 to 10 pounds, (2) use both hands for grasping, pushing and pulling but not for fine manipulation and (3) occasionally bend, squat and reach, but not crawl or climb. Dr. Reimer said that Pilarczyk could not use her feet for repetitive movements such as the pushing and pulling of controls. He marked "N/A" in the portion of the form reserved for describing limitations on a claimant's ability to sit, stand or walk during an eight-hour workday. He left blank the portion of the form reserved for narrative description of functional limitations. Dr. Reimer did not offer any diagnosis, objective findings or description of his examination.

On October 10, 1990 Pilarczyk underwent magnetic resonance imaging conducted by Dr. Glen Dobben (R. 140). That test showed mild cervical spondylosis[4] but no other spinal or thoracic abnormalities. Then Dr. Anthony DiGianfillippo examined Pilarczyk on October 30, 1990 and also diagnosed cervical spondylosis but no other ailments (R. 165). Pilarczyk told Dr. DiGianfillippo that her back and neck pain had worsened in the previous eight months (R. 166).

Finally, Dr. R. Provus conducted a CT scan of Pilarczyk's spine on January 22, 1991 (R. 147). Dr. Provus reported findings "suggestive of a herniation of the disc extending to the right at L5–S1," including "[e]xtensive facet disease."[5]

### 3. Procedural History

Pilarczyk filed an application for disability benefits on April 3, 1990, alleging an onset date of February 1, 1990 (R. 66).

---

3. Defined alternatively as "[i]nflammation of fibrous tissue" or "muscular rheumatism; term used to denote aching, soreness, or stiffness in the absence of objective abnormalities" (Stedman's Medical Dictionary ("Stedman's") 529 (5th unabr. lawyers' ed. 1982)).

4. "A general term indicating reactive changes in the vertebral bodies about the interspace" (Stedman's at 1322).

5. Stedman's at 505 defines a "facet" as a "small smooth area on a bone or other firm structure." "Facet disease" is not defined by Stedman's or in either party's brief.

Her application was denied both initially and on administrative reconsideration. She requested a hearing, which was held before Administrative Law Judge ("ALJ") Dennis Greene on April 25, 1991 (R. 26).

On June 27, 1991 ALJ Greene issued a written opinion denying Pilarczyk's application. She then sought review by the Appeals Council of HHS. On November 29, 1991 the Appeals Council denied review and adopted ALJ Greene's opinion as Secretary's final decision (R. 4). Pilarczyk then filed her appeal in this District Court.

### RULE 56 PRINCIPLES

On summary judgment this Court must rule in favor of Pilarczyk as the moving party if "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." For that purpose an issue is "genuine" if the record evidence would permit a reasonable factfinder to adopt the view of the nonmoving party (*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986); *Old Republic Ins. Co. v. Federal Crop Ins. Corp.*, 947 F.2d 269, 274 (7th Cir.1991)), while a fact is "material" if it would prove outcome-determinative under the substantive law (*Pritchard v. Rainfair, Inc.*, 945 F.2d 185, 191 (7th Cir.1991)).

Rule 56 principles dictate that Pilarczyk as movant must establish the lack of a genuine issue of material fact (*Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986)). In deciding whether that burden has been met, this Court must draw "all reasonable inferences" in favor of Secretary as the nonmoving party (*Allensworth v. General Motors Corp.*, 945 F.2d 174, 178 (7th Cir. 1991)).

### STATUTORY AND REGULATORY FRAMEWORK

Section 1382c(a)(3)(A) defines disability as:

inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months[.]

*Young v. Secretary of HHS*, 957 F.2d 386, 389 (7th Cir.1992) (case citations omitted) explains the process that guides Secretary's evaluation of a disability claim:

When considering whether a claimant is eligible for benefits, the Secretary uses a five-step inquiry: 1) is the claimant presently unemployed; 2) is the claimant's impairment or combination of impairments severe; 3) does the impairment meet or exceed any of the list of specific impairments (the grid) that the Secretary acknowledges to be so severe as to preclude substantial gainful activity; 4) if the impairment has not been listed by the Secretary as conclusively disabling, is the claimant unable to perform his or her former occupation; and 5) if the claimant cannot perform the past occupation, is the claimant unable to perform other work in the national economy in light of his or her age, education and work experience. A negative conclusion at any step (except for step three) precludes a finding of disability. An affirmative answer at steps one, two or four leads to the next step. An affirmative answer at steps three or five results in a finding of disability. 20 C.F.R. § 404.1520 (1991). The claimant bears the burden of proof in steps one through four. If that burden is met, the burden shifts to the Secretary to prove that the claimant cannot perform other work in the economy.

Step 3 requires Secretary to assess whether the claimant has an impairment specified in the Listing of Impairments (Part 404, Subpt. P, App. 1). Impairments found in the Listing mandate a finding of disability because they are "severe enough to prevent a person from doing any gainful activity" (Reg. § 404.1525(a)). Once a claimant makes it past step 3, Secretary must determine the claimant's "residual functional capacity" ("RFC"). Reg. § 404.-1567 defines the various levels of RFC as the ability to do "sedentary," "light," "medium," "heavy" or "very heavy" work.

That determination is then applied at steps 4 and 5 in different ways.

At step 4 Secretary must determine whether the claimant can return to his or her "past relevant work," defined by Reg. § 414.965(a) as:

> work performed within the past fifteen years, which lasted long enough for the claimant to learn how to do it, and which was substantial gainful employment.

That step 4 analysis requires Secretary to determine the exertional and nonexertional requirements of the past job. If the claimant's RFC level meets or exceeds the requirements of the past job, he or she must be deemed not disabled. But if the claimant's RFC falls short of the past job's requirements, Secretary proceeds to step 5.

At step 5 Secretary assumes the burden of proving that there are a significant number of jobs in the national economy that the claimant can perform despite his or her impairment. If there are not, then the claimant is deemed disabled. If there are, then Secretary must consult the "grid" (Medical Vocational Guidelines of Part 404, Subpt. P, App. 2). For each permutation of RFC and the applicant's "vocational factors" such as age, education and skills (Reg. §§ 404.1563–1565), the grid specifies whether a claimant will or will not be deemed disabled.

At step 4 there is no need to determine whether the claimant's past relevant work is actually available in the economy. At step 5, in contrast, the existence of jobs that the claimant can do is the essential fact to be proved. That difference in treatment reflects the assumption that work available within the past 15 years is still available today. If that assumption is "dramatically falsified in a particular case," however, the ALJ must conduct a step 5 analysis even if the claimant is physically capable of doing the past work (*Kolman v. Sullivan*, 925 F.2d 212, 213–14 (7th Cir.1991)).

## STANDARD OF REVIEW

District courts "decide[] disability cases ... by reviewing the final decision of the Secretary to ensure that it is supported by substantial evidence" (*Young*, 957 F.2d at 388). Reported cases regularly remind that "we may not decide the facts anew, reweigh the evidence, or substitute our own judgment for that of the ALJ" (*Meredith v. Bowen*, 833 F.2d 650, 653 (7th Cir. 1987)). "Substantial evidence" means (*Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1420, 1427, 28 L.Ed.2d 842 (1971), quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229, 59 S.Ct. 206, 216, 83 L.Ed. 126 (1938)):

> more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.

"Substantial evidence may be something less than the greater weight or preponderance of the evidence" (*Young*, 957 F.2d at 389).

Every ALJ has a duty to explain with particularity the basis of his decision. To quote once again from *Young, id.* at 393, "within reasonable limits, the reason for rejecting evidence must be articulated if there is to be meaningful appellate review." *Stein v. Sullivan*, 966 F.2d 317, 319 (7th Cir.1992), quoting *Brown v. Bowen*, 847 F.2d 342, 346 (7th Cir.1988), expands on that concept:

> [T]he level of articulation required is far from precise ... The requirement that the ALJ articulate his consideration of the evidence is deliberately flexible. "It is enough if the ALJ indicates the path of decision. The administrative tribunal need not spell out every step in the reasoning, if it provides enough of the steps that the full course may be discerned."

## ALJ GREENE'S DECISION AND REASONING

ALJ Greene found that Pilarczyk was unemployed (step 1) and was afflicted with various severe ailments: hypertension, gastritis, arthritis and a history of arteriosclerosis (step 2) (R. 17). At step 3 he found that those ailments did not meet or equal a listed impairment (*id.*). He rejected Pilarczyk's description of her pain and symptoms as "highly exaggerated in light of the objective medical evidence" (R. 18).

That led the ALJ to step 4, at which he found that Pilarczyk retained the RFC to do work-related activities, except those requiring her to lift more than 20 pounds at a time or walk more than 6 hours per day (id.). Because her work at Sears did not demand a higher RFC than that, ALJ Greene found that she could do her past relevant work. That determination required him to find that she was not disabled.

ALJ Greene stated several reasons for finding Pilarczyk not credible. First he said that the weight of the medical evidence did not indicate problems of the severity Pilarczyk alleged. ALJ Greene gave special weight to the opinion of Dr. Miezio, the treating physician, that "[a]ll of her problems are non-severe" (R. 16). He belittled Dr. Reimer's report—which did describe specific functional limitations—because Dr. Reimer did not describe the basis of his conclusions and because chiropractors are not among the approved sources of medical information under the Social Security regulations (R. 13).

Nor did ALJ Greene find the January 1991 CT scan to be significant. He said that Dr. DiGianfillippo "reviewed the results of this study [and . . .] recommended continued conservative therapy" (R. 14). In fact Dr. DiGianfillippo could not have reviewed the results of the CT scan, which was not performed until three months *after* he submitted his report. This error is discussed in more detail below.

ALJ Greene also emphasized that Pilarczyk's claims of severe pain as voiced at the hearing are not corroborated either by objective medical findings or by the presence of subjective complaints in the doctors' reports or notes (R. 16). Some aspects of Pilarczyk's testimony were specifically contradicted by the medical reports: For example, she claimed to walk with a limp, while Dr. Hirsen reported an unimpaired gait (id.). ALJ Greene also thought it significant that Pilarczyk had not sought continued treatment for her alleged heart condition and rheumatological difficulties.

ALJ Greene also observed that though Pilarczyk takes a veritable pharmacy of weekly medications, the only side effect she alleges is some morning "drogginess"—a complaint not noted in any physician's report (R. 16). He also found her daily activities (shopping, cleaning, cooking, walking and driving) indicative of an ability to handle a job outside the home (id.).

## PILARCZYK'S ARGUMENTS ON APPEAL

Pilarczyk argues that if ALJ Greene had moved on to step 5, Grid Rules 201.06 and 202.06 would have dictated a finding of disability because she is a person of advanced age with semiskilled work experience, no transferable skills and a high school education. Thus she concentrates her fire on the ALJ's reasoning at step 4.

Pilarczyk argues that the ALJ improperly discounted certain aspects of the medical evidence, leading to a faulty judgment about her credibility. She also argues that the ALJ was obligated to investigate the possibility of a mental impairment that might explain her claims of pain. Rectification of either error, she says, would trigger a step 5 analysis and a finding of disability.

### 1. Evaluation of the medical evidence.

ALJ Greene found that Pilarczyk's claims of disabling pain and other symptoms clashed with the medical evidence. He also thought that her daily activities indicated an ability to handle a job, and he observed that her medications caused no side effects other than morning "drogginess." For the most part the ALJ's logic cannot be faulted. For the weight of the medical evidence is indeed inconsistent with Pilarczyk's claims of pain, and Pilarczyk does maintain a fairly active schedule of daily activities. Furthermore, she cannot seriously argue that occasional "drogginess" renders her unable to handle a job— at least not on the current record, which indicates no significant functional limitations related to her regime of medication.

Only one issue requires further scrutiny: ALJ Greene's decision to discount the results of the CT scan. Pilarczyk argues

that the herniated disc and the facet disease shown by the scan provide all the objective support needed to corroborate her claims of pain. That claim is plausible. Pilarczyk's scan was conducted after all the other doctors in the case had weighed in with their findings. So while all of the doctors thought that Pilarczyk was healthier than she claims to be, none of them knew of the conditions revealed by the scan.

■ Reg. § 404.1529(a) states that a claimant need only show:

a medical impairment[ ] which could reasonably be expected to produce the pain or other symptoms alleged and which, when considered with all of the other evidence (including statements about the intensity and persistence of pain or other symptoms which may reasonably be accepted as consistent with the medical signs and laboratory findings), would lead to a conclusion that you are disabled.

Thus the claimant need not demonstrate that particular medical findings explain each and every symptom or sort of pain alleged. All she is required to show is a "reasonable" likelihood of such linkage to trigger further analysis by Secretary.

Whether a herniated disc and facet disease "could reasonably be expected" to cause the awful pain that Pilarczyk alleges is a medical question, beyond the expertise of an ALJ or a reviewing court. ALJ Greene discounted the scan because Dr. DiGianfillippo supposedly did not think the results were significant. But Dr. DiGianfillippo never even saw the results of the scan. Therefore the CT scan stands unrebutted and uninterpreted. Secretary must analyze the scan results on remand by reference to medical findings, and not by reference to a nonexistent evaluation of the scan results.

■ Secretary Mem. 12 n. 8 contends that Pilarczyk has failed to proffer medical evidence that links the scan findings to her complaints of pain. But by proffering the scan results Pilarczyk has met her burden of producing medical evidence. It is Secretary's duty to decide what weight to give

that evidence, and if he rejects it to explain the reasons for doing so. True enough, the Secretary's duty to articulate his reasoning is not a demanding one (*Stein*, 966 F.2d at 319–20). But Pilarczyk depicts the CT scan as the major piece of medical evidence in her favor. Surely she is entitled to a direct explanation of what weight Secretary has chosen to give the scan results and why.

■ By the same token, Secretary is entitled to consider not just the medical analysis of the scan but all the circumstances surrounding that test. For example, the record does not indicate that Pilarczyk sought any further diagnosis or treatment based on the scan in the three months between the scan and her hearing before ALJ Greene. That lack of treatment might be thought significant, if the scan was really the smoking gun that Pilarczyk now claims it to be. It should also be noted that the scan did not absolutely confirm the existence of a herniated disc—only "findings suggestive" of such an ailment.

■ Remand is necessary only when there is some reason to think that the outcome might differ. As *Herr v. Sullivan*, 912 F.2d 178, 182 (7th Cir.1990) (citation omitted) teaches:

An ALJ's credibility determinations will be affirmed on appeal unless the appellant can demonstrate that they are "patently wrong."

In this case, without a remand it is simply impossible to engage in a meaningful review of the credibility finding.

Assume that the CT scan does provide adequate medical support for Pilarczyk's claims of pain. Then the foundation of the credibility ruling—the supposed conflict between the medical evidence and the testimony—begins to crumble. Because Pilarczyk's daily activities and medication side effects were ancillary aspects of the credibility finding, they would have to be reconsidered in the light of the medical evidence. In short, it may well be that on remand ALJ Greene's credibility judgment would be disclosed as "patently wrong."

In turn Pilarczyk would presumably then be found to be incapable of resuming her

past relevant work. That conclusion would trigger a step 5 analysis and a likely finding of disability. It is perhaps regrettable that a single blunder by an ALJ should force a fresh look at this case, but the error is so patent and so basic—involving the final piece of medical evidence (one that could reconcile the claimant's claims of severe disabling pain)—that a remand is the only acceptable answer.

### 2. Mental Impairment

■ Pilarczyk also argues that the ALJ was required to investigate the possible existence of a mental impairment once he determined that objective medical evidence did not support Pilarczyk's claims of pain. SSR 88-13 does state that when medical evidence does not show a physiological source for a claimant's alleged pain, "the possibility of a mental impairment as the basis for the pain should be investigated."

■ Yet that language will not bear the weight that Pilarczyk hopes to impose upon it. No duty is imposed on an ALJ to conduct a psychiatric investigation unless the claimant (1) alleges a mental impairment at the time of the hearing and (2) comes forward with proof of such an impairment (Howell v. Sullivan, 950 F.2d 343, 348 (7th Cir.1991)).

Pilarczyk never alleged a mental impairment before filing her brief with this Court. Neither at the hearing nor in her brief has she pointed to any meaningful proof of such an impairment. ALJ Greene therefore committed no error by failing to investigate a possible mental impairment on his own. That issue need not be revisited on remand.

### 3. Proper standard for analyzing claims of pain.

■ Moothart v. Bowen, 934 F.2d 114, 117 (7th Cir.1991) holds that under Reg. § 404.1529 subjective claims of pain must always be corroborated by medical find-

ings. Secretary Mem. 10 n. 7 argues for application of the Moothart rule to this case. Not so. In the required remand to determine whether Pilarczyk has in fact produced corroborative medical evidence, it is not only unnecessary but it would be improper to apply Moothart. This brief discussion is included only to emphasize the conclusion reached by this Court just days ago in Thomas v. Sullivan, 801 F.Supp. 65 (N.D.Ill.1992), that Moothart is no longer good law.

■ Under a new version of Reg. § 404.-1529 that took effect in November 1991, Secretary has made clear that a claim of subjective pain should never be rejected solely for lack of supporting medical evidence. That new regulation, Secretary conceded in Thomas, does not represent any change in his policy but does repeal the Moothart rule. Absence of objective medical evidence may be one factor in the decision not to credit claims of pain, but it cannot be the only factor (Thomas, id. at 73).

It follows that Moothart construed HHS policy more strictly than was proper. Once corrected by Secretary, courts in this circuit have no business applying the mistaken rule announced by our Court of Appeals in reliance on Secretary's then-existing regulation[6]—even in cases decided after the effective date of the new regulation (Thomas, id. at 72-73). No insult is intended to the drafters of Secretary's brief in this case, which was completed before Thomas was decided. But this Court would hope that Secretary will not cite Moothart in future briefs, and it expects that Secretary will not apply the Moothart rule on remand in the instant case.

### CONCLUSION

Pilarczyk's motion for summary judgment is denied. This case is remanded to Secretary for further proceedings consistent with this opinion. On remand, Secre-

---

**6.** As in Thomas, this Court should again emphasize that Moothart was a classic instance of induced error. Our Court of Appeals there expressly acknowledged that it was not making policy—merely applying Secretary's. And Sec-

retary has now said that the new regulation reflects what has always been HHS policy—so that the readings previously given to the old regulation were simply misled by the way that it expressed itself.

tary is instructed to reconsider the significance of the CT scan and, if that reconsideration compels a fresh look at the rest of the evidence, to do that as well. No other issues need be considered on remand.